VERMONT SUPERIOR COURT
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org

ENVIRONMENTAL DIVISION
Docket No. 25-ENV-00037



| 2508 West Lake Road Nonconforming Structure | DECISION ON MOTION |
|---|---|

In this matter Wyldwood Lodge LLC (Appellant) appeals a May 8, 2025 decision of the Town of Poultney (Town) Development Review Board (DRB) approving Joseph and Patricia Adams' (Applicants) application for alternations to, and enlargement of, a nonconforming structure located at 2508 Westlake Road, Poultney, Vermont (the Property). Presently before the Court is Applicants' motion for summary judgment on all issues before the Court. Appellant opposes the motion.[1]

In this matter, Appellant is represented by Justin Barnard, Esq. Applicants are represented by Frank Urso, Esq. The Town has not appeared.

## Legal Standard

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2). When considering a motion for summary judgment, the nonmoving party receives the benefit of all reasonable doubts and inferences. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356 (citation omitted). In determining whether there is a dispute over any material fact, "we accept as true allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." White v. Quechee Lakes Landowners' Ass'n, Inc., 170 Vt. 25, 28 (1999) (citation omitted); V.R.C.P. 56(c)(1)(A).

## Factual Background

---

[1] In support of their Reply memorandum, Applicants filed a supplemental Declaration of Joseph Adams which contains further "Background and Context," from the Applicants' perspective, and legal argument in support of their position. Appellants have moved to strike that Declaration as untimely and beyond the scope of the issues raised in the Appellant's Memorandum in Opposition to Motion for Summary Judgment. The Court agrees that the Declaration addresses matters, both factual and legal, that are beyond the scope of the Memorandum in Opposition and presents legal argument that is redundant of, or in addition to, Applicants' authorized briefing under Rule 56. Therefore, the Motion to Strike is GRANTED.

We recite the following facts solely for the purpose of deciding the pending motion. These facts do not constitute factual findings because factual findings cannot occur until after the Court conducts a trial. Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (mem.).

1. Applicants own the Property which is a .33-acre parcel with frontage on Lake St. Catherine.

2. The Property is developed with a one-family dwelling known as "Sagamore."

3. Sagamore has been Applicants' primary and exclusive residence since 2021.

4. Sagamore is a nonconforming structure due to its failure to meet side setbacks.

5. The Property is located in the Town's Lake Shore (LS) zoning district, as identified in the Poultney Unified Bylaws (Bylaws).

6. The Property adjoins a one-acre parcel owned by Appellant, which is also developed with a residential dwelling.

7. In October 2024, Applicants applied for a zoning permit for alteration of a nonconforming structure (2024 Application).

8. A 2024 Town Lister's Card shows the exterior dimensions of Sagamore totaling approximately 1,513 square feet.[2]  Appellant Ex. 3.

9. At the time of application, Sagamore consisted of a first-floor living area and an attic storage space beneath a single, sloped hip roof, with a dormered window on the lake side.

10. The 2024 Application initially proposed to enlarge the ground floor area on Sagamore's north side (opposite Appellant's property) by 160 square feet, in addition to certain modifications to the attic space that increased the volume of that space but did not propose to change its square footage or the footprint of the attic area.[3]

11. The 2024 Application was subsequently amended to reduce the first-floor enlargement to 150 square feet. This was done to avoid encroaching further into the 20-foot side yard setback on the north side.

---

[2] Applicants and the DRB calculated the total square footage of the Sagamore's footprint at 1,526 square feet, based on dimensions of 43' by 35.5', as stated in the 2024 Application. Appellant disputes this square footage calculation, but does not appear to dispute that the Sagamore's pre-construction footprint as of 2024, including all enclosed or partially enclosed features, was at least 1,513 square feet. See Appellant Ex. 3 (Town Lister Card 2024); Appellant's Statement of Additional Material Facts ¶¶ 4–7. Therefore, it is undisputed that the Sagamore's pre-alteration footprint was at least 1,513 square feet. In addition, for the reasons set forth herein, this dispute is immaterial to the merits of the application's compliance with the Bylaws.

[3] The Court understands from Applicants' 2023 Application, discussed infra, that the attic modification was accomplished by raising the height of the walls and roof, while staying within the 30' maximum height limit for the LS District. Bylaws, § 501(Table).

12. As amended, the 2024 Application presented two options for approval: Option A, consisting of a new 150-square-foot ground floor addition (enlargement) and 542 square feet of remodeled existing attic space (692 square feet total); and Option B, consisting of a new 150-square-foot ground floor addition (enlargement) and 698 square feet of remodeled existing attic space (848 square feet total).

13. Neither option proposes to alter the existing structure's footprint in the attic area.

14. As part of their application, Applicants submitted a plan showing their proposed first floor addition, area calculations and setbacks, among other information. Ex. A. The plan states on its face: "There will be no enlargement of the area of the second floor."

15. Applicants also submitted copies of an "Affidavit of Single Family Residence," signed by a former owner of Sagamore, and a Shoreland Protection Individual Permit, dated March 25, 2024, approved by the Vermont Agency of Natural Resources (ANR). Ex. C; Ex. D.

16. In connection with their application for a Shoreland Protection Permit, Applicants prepared a plan titled "New Construction on Impervious [L]and and New Construction on Natural Pervious Land" depicting, among other things, the existing cottage, areas of proposed "extension," the shoreline of Lake St. Catherine, measured distances from the mean water level to the closest points of the existing cottage and the extension and dripline trench and tree plantings to be installed.[4] Ex. E.

17. Prior to submitting the 2024 Application, Applicants had applied for a zoning permit in October 2023 (2023 Application) that initially proposed to enlarge the first floor of Sagamore by 12 feet to the north and west, in addition to modifications to the attic space, for a total of 940 square feet of expanded/modified space. As part of the 2023 Application, Applicants had calculated this "new interior space" to be 30.7% of the "existing interior space."

18. In November 2023, Applicants amended the 2023 Application to reduce the "total proposed new expansion from 940 s/f down to 889 s/f" bringing the new expansion to 29% of the "existing interior space."

19. On January 11, 2024, the DRB held a public hearing on the 2023 Application and denied the application. The DRB's decision is reflected in its January 11, 2024 meeting minutes. The minutes state that the 2023 Application was denied "based on the failure of the Applicant to meet requirements of section 710.A. of the Poultney Unified Bylaws ("PUB") and Section 710.C. of the PUB, and further

---

[4] The plan states that the "[d]ripline trench will be filled with gravel, at least 8 inches deep and 18" wide." Ex. E.

that the Application does not qualify for a Waiver pursuant to Section 1704 of the PUB or Variance pursuant to 1705 of the PUB."

20. The January 11, 2024 minutes do not contain findings of fact or conclusions of law tied to the findings.

21. At the time the 2024 Application was submitted, the Bylaws adopted May 9, 2022 were in effect. Appellant's Ex. 18.

22. On May 8, 2025, the DRB approved the 2024 Application pursuant to the Bylaws, finding that both Options A and B proposed a 150-square-foot addition to the ground floor, as well as remodeling of the second-floor area of 542 square feet (692 square feet total) and 698 square feet (848 square feet total), respectively. The DRB further found that the existing structure "consists of approximately 3,052 square feet of enclosed areas under a single hip roof." The DRB concluded that the 2024 Application complied with § 710(A) and § 201(L) of the Bylaws.

23. Appellants timely appealed to this Court.

24. Appellant's Amended Statement of Questions raises four issues related to the 2024 Application's compliance with § 710(A) and § 201(L) of the Bylaws.

<u>Discussion</u>

Applicants have moved for summary judgment on all Questions in Appellant's Amended Statement of Questions. See Amended Statement of Questions (filed on October 28, 2025). Each Question is restated in full below for ease of reference.[5] The Court begins with Question 2 because it raises a threshold issue and then addresses each of the remaining Questions in turn.

**I.      Question 2**

Question 2 asks:

> Where (a) the Poultney Development Review Board denied Applicants' prior 2023 application to enlarge the structure at issue, (b) its decision necessarily rejected Applicants' argument that the "total area" of the structure was 3,052 square feet, and (c) Applicants did not appeal the prior decision, are Applicants estopped under the successive application doctrine and principles of res judicata from arguing that the "total area" of the structure is 3,052 square feet in seeking to establish that their present application complies with PUB § 710(A)?

"The successive-application doctrine is an application of claim preclusion, or res judicata, in the special environment of zoning adjudication—it applies to the overall claim that the project is

---

[5]  Question 3 of Appellant's original Statement of Questions was withdrawn, as indicated in its Amended Statement of Questions.

4

entitled to a permit."[6]  In re Application of Lathop Ltd. P'ship I, 2015 VT 49, ¶ 59.  Under the successive application doctrine, a local board "may not entertain a second application concerning the same property after a previous application has been denied, unless a substantial change of conditions had occurred or other considerations materially affecting the merits of the request have intervened between the first and second application."  Id. at ¶ 58 (citing Carrier, 155 Vt. 152, 158 (1990) (quotation omitted); In re Woodstock Cmty. Tr. & Hous. Vt. PRD, 2012 VT 87, ¶ 4.  The second application can be granted, however, "when the application has been substantially changed so as to respond to objections raised in the original application or when the applicant is willing to comply with conditions the commission or court is empowered to impose."  Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 58 (citing Carrier, 155 Vt. at 158).  Thus, the successive-application doctrine "carves an exception out of the otherwise rigid standard of preclusion of § 4472(d) to allow local boards the ability to respond to changing circumstances that often arise in zoning decisions."  Id. (citing Woodstock Cmty. Tr., 2012 VT 87, ¶ 4; Dunkin Donuts, 2008 VT 139, ¶ 9.

Bylaws § 710.A allows the enlargement of a nonconforming structure, like Sagamore, on the same lot provided that: "The total enlargement or sum of separate enlargements does not exceed thirty (30) percent of the total area of the nonconforming structure in existence at the time of the adoption of these regulations."  Bylaws § 710.A.

The 2023 Application calculated the total area of Sagamore as 3,053 square feet (43' x 35.5' = 1,526.5 x 2).[7]  As amended, the 2023 Application reduced the size of the proposed "total enlargement" to 889 square feet.[8]  This is less than 30% of 3,053 square feet and would apparently satisfy Bylaws § 710.A.  Despite this, the DRB denied the application.  Thus, it is possible to infer that the denial may have been based, in part, on the DRB's rejection of Applicants' total area calculation.

---

[6]  Claim preclusion, a principal barring the relitigation of claims already determined between parties, "operates with more flexibility when applied to municipal zoning decisions than to civil decisions."  In re Ferro & Pomeroy Demo/Const. Permit, No. 197-10-09 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Nov. 22, 2011) (Durkin, J.) (citing In re Dunkin Donuts Site Plan Amendment Application, 2008 VT 139, ¶¶ 10–11; see generally Faulkner v. Caledonia Cty. Fair Assoc., 2004 VT 123, ¶¶ 8–10, 178 Vt. 51.  Indeed, in this Court claim preclusion "does not apply to administrative proceedings as an inflexible rule of law."  In re Carrier, 155 Vt. 152, 157 (1990).  Although the principles of claim preclusion "generally apply in zoning cases as in other areas of the law," the doctrine of finality under 24 V.S.A. § 4472(d) implicates a distinct set of preclusive rules, which include both the so-called Stowe Club Highlands/Hildebrand doctrine applicable to permit amendments and the successive application doctrine, developed specifically for zoning proceedings of this nature.  Lathrop Ltd P'ship I, 2015 VT 49, ¶ 59; In re Wells Accessory Bldg. Application, No. 177-12-14 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Aug. 11, 2015) (Durkin, J.).

[7]  Depending on rounding, the total area square footage is alternately stated as 3,052 or 3,053 square feet. This discrepancy is immaterial to the Court's conclusion in this case.

[8]  This figure presumably includes the attic modifications as well.

5

However, the total area of the structure is not expressly stated anywhere in the DRB's January 11, 2024 decision and the factual and legal basis for the DRB's decision is unclear.[9] Appellant's Ex. 7. Indeed, the January 11, 2024 decision, while unappealed and final under 24 V.S.A. § 4472(d), is completely inadequate under the requirements of 24 V.S.A. § 4464(b)(1) in that it fails to include a proper statement of the factual bases on which the DRB made its conclusions.[10] See 24 V.S.A. § 4464(b)(1) ("Decisions shall be issued in writing and shall include a statement of the factual bases on which the appropriate municipal panel has made its conclusions and a statement of the conclusions. The minutes of the meeting may suffice, provided the factual bases and conclusions relating to the review standards are provided in conformance with this subsection."). Therefore, the Court cannot discern the precise legal basis for denying the 2023 Application with any degree of certainty.

Applicants argue that the 2024 Application constituted a substantial change from the 2023 Application that attempted to respond to what Applicants perceived as the basis for the DRB's denial. They observe that the 2024 Application proposed reductions to the setback encroachment on the north side of Sagamore, reduced the size of the proposed enlargement of the first floor, and reduced the proposed modification/remodeling of the attic space. The 2025 DRB decision states that "[a] revised permit application was submitted on October 30, 2024, proposing a materially smaller expansion. The revised proposal eliminated the previously requested setback encroachment and included two alternative options (A and B) for expansion." Appellant's Ex. 10.

Appellant admits that the 2024 Application reduced the size of the overall expansion but contends that the 2024 Application was also required to "address all concerns that prevented approval of the prior application." In re Armitage, 2006 VT 113, ¶ 4. Of course, as discussed above, the

---

[9] Applicants argue that the DRB's January 11, 2024 decision was "cryptic and made no mention of Total Area; nor did it mention or find that the Total Area consisted of any amount of square feet." The Court agrees.

[10] The DRB's January 11, 2024 decision does not contain the word "findings" and the closest it comes to making findings of fact is the following language, which is wholly inadequate to form the basis for a decision:

> I.      Attorney Thrasher presented the Applicant's case as to why the application should be granted, and proceeded to present his position by going through the "Zoning Application Review" he had submitted on behalf of the Applicants[.]
>
> II.      Attorney Barnard presented the neighbor's case as to why the application should be denied by going through the "Memorandum of Wyldwood Lodge, LLC" he submitted on behalf of his client, as an interested party, in opposition to the Application.
>
> III.      Joe Adams testified that the cottage is currently 2 bedrooms, and would remain 2 bedrooms after the alterations have been made, provided the Application is approved. He testified that the upstairs contains a room that had previously accommodated cots and mattresses, which upstairs is accessed by a pull-down staircase.

6

January 11, 2024 decision provides almost no guidance on the concerns that prevented approval of the 2023 Application.[11] However, to the extent the DRB's conclusions suggest that it took issue with the size of the proposed enlargement and the setback encroachment, the 2024 Application attempted to—and did—respond to both of those objections.[12]

For the foregoing reasons, the material facts are not in dispute and Applicants are entitled to judgment as a matter of law on Question 2. Therefore, the Court concludes that the 2024 Application's total area calculation of 3,052 (or 3,053) square feet was not barred by the successive application doctrine or by other forms of claim preclusion and we answer Question 2 in the negative. Applicants' motion with respect to Question 2 is **GRANTED**.

**II.      Question 1**

Question 1 asks:

> Must . . . Applicants' . . . application for a permit to enlarge the nonconforming structure at issue be denied on the ground that the proposed expansions exceed 30% of the total area of the structure in existence at the time the Town's bylaws were adopted, in violation of Section 710(A) of the . . . Bylaws . . .?

This Question requires the Court to determine whether the expansion proposed in the 2024 Application exceeds 30% of the total area of Sagamore, a nonconforming structure, as it existed on May 9, 2022, the date the Bylaws were adopted. The fundamental dispute between the parties involves the meaning of the words "total area" as they are used in § 710.A. Appellant argues that total area is determined based on the Bylaws' guidance for calculating the gross floor area of a structure, considering only those areas used for human occupancy that are greater than six feet from floor to ceiling. Applicants, on the other hand, state that the Court should construe total area as the DRB did below, meaning the total floor surface area of a structure. The DRB stated:

---

[11] As previously noted, there may be an argument that the DRB's rejection of the application was based on its rejection of Applicants' calculation of total area. Due to the lack of guidance in the DRB's January decision, however, the Court has no way to determine if this is the case.

[12] To the extent that Appellant asserts that Applicants are precluded from relying upon the square footage that— Appellant contends—was implicitly adopted by the DRB in denying the 2023 Application, this assertion is inconsistent with the successive application doctrine. This doctrine applies to projects and applications submitted to a DRB not typically to background facts regarding parcels on which a project is located. While it could be possible for there to be preclusive effect related to a fact such as this based on the content of a municipal panel's decision, such is not the case here. For example, consider a project that was denied at least in part for failure to comply with lot coverage requirements but was silent on the relevant lot size. Appellant would have the Court conclude that, even if the applicant came back with a differently scoped project, the applicant could not advocate for, or rely on, the same lot size because the prior application was denied on lot coverage grounds, generally. Without more discussion from a panel, this is not the purpose of the successive application doctrine or its application.

2.    "Total Area" is not defined in the Bylaws.  Pursuant to [Article XIV of the 2022 Bylaws][13] undefined terms shall carry their customary meanings.  The DRB finds that "Total Area" refers to the total floor surface area of the structure, including all enclosed space under the primary roof.

3.    Based on this interpretation, the existing structure has a Total Area of 3,052 sq. ft.  Thirty percent of this area is 915.6 sq. ft.  Both Option A (692 sq ft) and Option B (848 sq ft) fall below this threshold and are therefore permissible under Section 710(A).

Appellant's Ex. 10.

We review zoning ordinances according to the principles of statutory construction.  In re Confluence Behavioral Health, LLC, 2017 VT 112, ¶ 17.  When interpreting a zoning ordinance, the Court's goal is to effectuate the intent of the drafters, first by looking to the plain meaning of the regulation at issue and the "whole of the ordinance."  Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 13 (quotation omitted).  In construing statutory or ordinance language, our paramount goal is to implement the intent of its drafters.  Morin v. Essex Optical/The Hartford, 2005 VT 15, ¶ 7, 178 Vt. 29.  We are "bound by the plain meaning of the words . . . unless the express language leads to an irrational result."  Tyler Self-Storage, 2011 VT 66, ¶ 6 (quotation omitted).  If there is no plain meaning apparent, the Court attempts to discern the intent from other sources.  In re Stowe Club Highlands, 164 Vt. 272, 280 (1995).  We will therefore "adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense."  In re Laberge MotoCross Track, 2011 VT 1, ¶ 8, 189 Vt. 578 (quotation omitted); see also In re Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 22 (quoting Lubinsky v. Fair Haven Zoning Bd., 148 Vt. 47, 49, 195 Vt. 586 (1986)) ("Our goal in interpreting [a zoning regulation], like a statute, 'is to give effect to the legislative intent.'").  Finally, because zoning regulations limit common law property rights, we resolve any uncertainty in favor of the property owner.  Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 22.  With these principles of interpretation in mind, we turn to the applicable regulatory provisions.

The Bylaws do not define "total area."[14]  Therefore, we are directed by the Bylaws to accord those words their "customary meaning."  The customary meaning of a term may be understood by reference to dictionary definitions.  Rte. 4 Assocs. v. Town of Sherburne Planning Comm'n, 154 Vt. 461, 464 (1990) (citing State v. Yudichak, 147 Vt. 418, 420 (1986)) ("The dictionary is merely a

---

[13] The Court understands that the DRB decision mistakenly refers to a different version of the Bylaws containing a different article number for the Definitions section, but the language is identical to that contained in the 2022 Bylaws: "Except where specifically defined herein, all words used in these regulations shall carry their customary meanings." Bylaws at Art. XIV.

[14] The words "total" and "area" are neither individually defined, nor defined as part of the term "total area."

compendium of plain and commonly accepted meanings, which we presume are intended by statutory language."); In re Vermont Nat. Bank, 157 Vt. 306, 313 (1991) (use of the dictionary is accepted way to arrive at the meaning of language).

"Total" means "comprising or constituting a whole: entire (the *total* amount)." Merriam-Webster Dictionary, total (online), accessed Apr. 15, 2026. This is consistent with other definitions of "total," when used before a noun, as meaning "including everything." Cambridge Dictionary, total (online), accessed Apr. 15, 2026.

"Area" means "the surface included within a set of lines[,] *specifically*: the number of unit squares equal in measure to the surface." Merriam-Webster, area (online), accessed Apr. 15, 2026. This is generally consistent with other dictionary definitions of "area" such as "the size of a flat surface calculated by multiplying its length by its width." Cambridge Dictionary, area (online), accessed Apr. 15, 2026; see e.g., Kelbro, Inc. v. Myrick, 113 Vt. 64, 66 (1943) (describing certain billboards as "each 24 feet long by ten feet high, having an *area* of 240 square feet each") (emphasis added).

Given these definitions, the Court concludes that "total area" as used in Bylaws § 710.A is "the total floor surface area of the structure, including all enclosed space under the primary roof" and that definition is reasonable and consistent with the customary meaning of the words. The plain meaning of total area in the context of § 710.A is the sum of the flat surfaces (i.e., floors) within the nonconforming structure—whether measured in square feet or some other unit—calculated by multiplying length times width. This calculation includes "everything" within the defined set of lines (whether measured from the interior or exterior walls) and does not differentiate between functional/non-functional or usable/unusable space.[15] While total area may arguably be calculated differently in other contexts, and while other specialized definitions may exist, this interpretation of the plain meaning of the words is consistent with their customary meaning based on the foregoing dictionary definitions.

Appellant argues that the Court should refer to the definition of "Gross Floor Area" to interpret the meaning of total area. The Bylaws define "Gross Floor Area" as:

> The sum of the areas of the several floors of a building, including areas used for human occupancy in basements, attics, and penthouses, as measured from the exterior faces of the walls, but excluding any area

---

[15] There is nothing within the Bylaws to suggest limiting total area to functional/usable or non-functional/unusable space. The Court will not read such a limitation into the Bylaws. See Smtih v. Desautels, 2008 VT 17, ¶ 18 (citing Brennan v. Town of Colchester, 169 Vt. 175, 177 (1999) (the Court "will not read an implied condition into a statute unless it is necessary in order to make the statute effective.") (citation and quotation omitted)). To the extent that the Bylaw is ambiguous, that ambiguity must be resolved in Applicants' favor. Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 29.

9

where the floor-to-ceiling height is less than six feet. It does not include cellars, unenclosed porches, or attics not used for human occupancy, or any such floor space intended and designed for accessory heating and ventilating equipment. It shall include the horizontal area at each floor level devoted to stairwells and elevator shafts.

Bylaw at Art. XIV (Gross Floor Area).

The relevant Bylaws section does not use the term "gross floor area." Apart from the Definitions section, the Bylaws use the term "gross floor area" in only one place—to define the "Minimum & Maximum Gross Floor Area per Dwelling Unit" for an Elderly Housing Complex. Bylaws at § 410.C.1.c. Certainly, the Town could have defined total area to be similar to the definition of Gross Floor Area, or it could have used the term "gross floor area" in Bylaws § 710.A. It did neither. Having failed to adopt a specific definition of total area, however, and having defined "gross floor area" and used it in an unrelated section of the Bylaws, we cannot read the definition of "gross floor area" as synonymous with total area.[16] Such a reading would contravene the plain and customary meaning of total area. The Bylaws distinguish the terms "gross floor area" and "total area." We presume they do so advisedly and that their meanings are intended to be different. See Carpin v. Vt. Yankee Nuclear Power Corp., 2024 VT 27, ¶12 (citing New Eng. Phoenix Co. v. Grand Isle Veterinary Hosp., Inc., 2022 VT 10, ¶ 20 ("[W]e presume that the Legislature chooses statutory language intentionally, so different words carry different meanings.")).

As discussed above, the Court concludes that the meaning of total area is plain, such that we do not need to resort to other rules of construction. The word "total," in particular, is not susceptible to different interpretations. To the extent that the word "area" could be considered to have different meanings, we note again that in the absence of a specific definition in the Bylaws, we must resolve any ambiguity in favor of the Applicant as property owner. Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 29 ("[B]ecause zoning ordinances are in derogation of private property rights, they must be construed narrowly in favor of the property owner . . . and any ambiguity is resolved in favor of the landowner." (citing Tyler Self-Storage, 2011 VT 66, ¶ 16 (internal quotations omitted)). For all of the foregoing reasons, the material facts are not in dispute and Applicants are entitled to judgment as a matter of law on Question 1. Thus, we answer Question 1 in the negative and in favor of Applicants. Applicants' motion on Question 1 is **GRANTED**.

---

[16] Appellant argues that we should construe the word "gross" to be synonymous with "total," but it is clear from the definition of "gross floor area"—which contains certain express exclusions—that gross floor area as used in the Bylaws means something less than total.

### III. Question 4

Question 4 asks:

> Must Applicants' application for a permit to enlarge the nonconforming structure at issue be denied on the ground that it seeks to convert a seasonal dwelling to year-round use and Applicants have failed to obtain either a potable water supply or wastewater system permit or exemption from the Agency of Natural Resources, as required by PUB § 201(L)?

In the LS District "[n]o Zoning and/or Building permit for a change of use (including conversion of seasonal dwellings to year-round residences) will be approved until an applicant obtains a potable water supply and wastewater permit or exemption from the Agency of Natural Resources." Bylaws § 201(L)(1).

In this case, the 2024 Application expressly seeks approval for "alteration to a Nonconforming Structure." Appellant Ex. 8. That same application states that "[a] Permit must be applied for and approved prior to any change of use of an existing structure or property."[17] Id. The DRB, in its decision, found that the "Applicants provided an affidavit attesting to year-round residential use of the property since 1986. The property has operated as a two-bedroom single family home." Appellant Ex. 10. Thus, the DRB concluded that the affidavit provided by Applicants was sufficient to establish compliance with § 201(L)(4) regarding potable water and wastewater permits. Id.

Notwithstanding the DRB's discussion of § 201(L)(4) in its decision, the 2024 Application on appeal does not request approval of a change of use and it does not appear from the Bylaws that a change of use permit is a necessary prerequisite to approval of an application to enlarge a nonconforming structure under Bylaws § 710. Unless and until such an application is submitted, the issue of whether a change of use permit is otherwise required is beyond the scope of the pending application and this Court's jurisdiction. See, e.g., In re Torres, 154 Vt. 233, 235 (1990) ("The reach of the superior court in zoning appeals is as broad as the powers of the zoning board of adjustment or a planning commission, but it is not broader"); see also In re Costco Final Plat & Site Plan, et al., Nos. 104-8-12 Vtec, 48-6-20 Vtec, slip op. at 13 (Vt. Super. Ct. Envtl. Div. Sept. 2, 2021) (Durkin, J.) ("[T]he scope of our review is limited to the application before us.") (citation omitted). Accordingly,

---

[17] This requirement is consistent with Bylaws § 204 and Article XIV (definition of Development) and 24 V.S.A. § 4449(a)(1) and § 4303(10) (definition of land development).

Question 4 is **DISMISSED** pursuant to V.R.C.P. 12(h)(3) as being outside the Court's jurisdiction in this appeal.[18]

### IV.    Question 5

Question 5 asks: "Must Applicants' application for a permit to enlarge the nonconforming structure at issue be denied on the ground that it contemplates development within fifty feet of Lake St. Catherine and Applicants failed to submit an erosion prevention plan with their application, as required by PUB § 201(L)?"  Bylaws § 201(L)(3) states that "[a]ny development within 50 ft. of the Lake St Catherine shoreline must contain an erosion control plan with the zoning application."[19]

Putting aside that proceedings before this Court are by trial de novo and, hence, Applicants have not yet presented their application and any supporting materials to the Court, Applicants argue that the Shoreland Protection Individual Permit (Permit No. 4165-SP or Shoreland Permit) that they obtained from the ANR, pursuant to 10 V.S.A. § 1441 et seq., is sufficient to constitute an erosion control plan for the purpose of compliance with § 201(L)(3).[20]  Appellant disagrees.

The Shoreland Permit contains both specific and standard conditions pertaining to how cleared area and impervious surface associated with the Applicants' project will be addressed to protect shoreland areas and the lake, including that "the permittee shall use best management practices in accordance with the plan proposed in the permit application."  See Ex. D, Conditions 4 & 5. Regarding those best management practices, the Shoreland Permit expressly states among its specific conditions:

> 4. . . . Best management practices shall consist of the permittee installing at least 100 linear feet of gravel drip line infiltration trench that is at least 8 inches deep and 18 inches wide along the perimeter of the house. Best management practices shall be installed upon completion of the authorized project and be maintained to function as designed thereafter. The permittee shall amend this permit if best management practices fail or are inadequate at managing, treating, and controlling erosion due to stormwater runoff. No alteration to best management practices shall occur without additional authorization.

---

[18] The Court further notes that material facts appear to be in dispute related to whether Sagamore is a permanent residence.  If the Court were to hear this Question, it would require the parties to present evidence to the Court on the issue of change of use.  Absent an application for a change of use, however, it would be improper for the Court to hear/receive such evidence.

[19] See also Bylaws § 1532 (Erosion Control Plan) containing the same requirement; § 1533 (Slope) (imposing additional requirements to prevent soil loss and protect natural and man-made critical features such as . . . natural areas from unstable slope/soil conditions, erosion and sedimentation resulting from construction earthwork).

[20] Applicants do not appear to dispute that some of the work involved with their project will occur within 50 feet of Lake St. Catherine's shoreline.

5. . . . Best management practices shall consist of the permittee establishing 8 square feet of vegetative cover located within 50 feet from mean water level on the southwest side of the parcel. Establishing vegetative cover shall consist of converting a cleared area footprint to one that consists of trees, shrubs, ground cover, and duff. Best management practices shall be established upon completion of the authorized project and demarcated as necessary to ensure compliance with this condition. No alteration to best management practices shall occur without additional authorization. Cleared areas are those areas not managed in accordance with the vegetation protection standards in 10 VSA § 1447.

The Shoreland Permit's standard conditions also provide requirements for erosion control and bank stability management (Standard Condition 3) and establishment of vegetative cover (Standard Condition 4).

The Shoreland Permit references a plan, titled "New Construction on Impervious [L]and and New Construction on Natural Pervious Land" that depicts, among other things, installation of gravel dripline infiltration trench on the north and south sides of Applicants' dwelling (with the notation "Dripline trench will be filled with gravel, at least 8 inches deep and 18" wide"), as well as proposed tree plantings.[21]  Applicant Ex. E.  In the Shoreland Permit, ANR finds that these steps (i.e., installation of gravel dripline infiltration trench and tree planting) are consistent with best management practices for lakeshore erosion control.  Nothing in the Bylaws dictates what must be included in an "erosion control plan," as referenced in § 201(L)(3), nor is that term defined in the Bylaws.  ANR has the authority to enforce compliance with the Shoreland Permit and there is nothing in the Bylaws or Chapter 117 of Title 24 that precludes the Town (or this Court on appeal) from accepting the Shoreland Permit, including its conditions and plan, as an erosion control plan for the purposes of § 201(L)(3).  In so doing, the Permit's terms, conditions and plan would become enforceable elements of the local permit.   Appellant presents no credible argument to the contrary.

Based on the foregoing, the material facts are not in dispute and Applicants are entitled to judgment as a matter of law on Question 4.  In so determining, the Court concludes that the Shoreland Permit, and the conditions and plan associated therewith, constitute an erosion control plan within the meaning of § 201(L)(3).  Therefore, we answer Appellant's Question 5 in the negative.

---

[21]  The Court understands while the DRB may have been aware of the Shoreland Permit, neither the Shoreland Permit nor the associated plan were submitted to the DRB as part of the 2024 Application.  In this de novo proceeding, Applicants may properly supplement their application materials with any information that may have been lacking when the application was submitted to the DRB.

## Conclusion

For the foregoing reasons, the Court finds that the material facts are not in dispute and Applicant is entitled to judgment as a matter of law on Questions 1, 2 and 5 of Appellant's Amended Statement of Questions. Thus, Applicants' motion for summary judgment is **GRANTED** on those Questions. Question 4 is **DISMISSED** pursuant to V.R.C.P. 12(h)(3) as beyond the jurisdiction of the Court at this time.

This concludes the matter before the Court. A Judgment Order shall accompany this decision.

Electronically signed on April 16, 2026, pursuant to V.R.E.F. 9(d).

Joseph S. McLean
Superior Court Judge
Environmental Division

14